DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Brenda Page, has appealed from the judgment of the Summit County Court of Common Pleas, Juvenile Division, which terminated her parental rights to her child, D.P., and placed her in the permanent custody of the Summit County Children Services Board ("CSB"). We affirm.
 I. {¶ 2} Appellant is the mother of D.P., born August 28, 1996. David Page was married to Appellant at the time of the birth of D.P., and was therefore legally presumed to be the child's father. See R.C.3111.03(A)(1). Appellant and Page were subsequently divorced. Appellant and Page were each served with notice of these proceedings and participated below. However, on the first day of the permanent custody hearing, Appellant announced that Russell Mullins might be the biological father of the child, and also declared that he was the only other possible father of D.P. The trial court ordered genetic testing of Page and he was excluded as a possible biological father. Page nevertheless sought legal custody based on his relationship with the child. Ultimately, the trial court denied Page's motion for legal custody. As to Mullins, service was then attempted. Mail service was unsuccessful, but service by publication was accomplished. Mullins did not make an appearance in this case and his parental rights were also terminated by the trial court. Neither Page nor Mullins has appealed from the judgment below.
 {¶ 3} During a previous involvement with CSB, D.P. was removed from Appellant's care and placed in the temporary custody of the agency for 18 months, from April 3, 2001 until October 1, 2002. The child was then returned to the care of Appellant on October 2, 2002 with an order of protective supervision. The order of protective supervision was terminated on January 10, 2003 and the case was closed on January 30, 2003.
 {¶ 4} CSB's present involvement with the family began on February 24, 2003 when D.P. was removed from Appellant's care pursuant to Juv.R. 6. The police were dispatched to the residence based on information that Kevin Lowry was living at the residence. Lowry was under a court order forbidding contact with D.P. because of sexual misconduct allegations. The child was subsequently adjudicated as abused and dependent. The trial court found that Appellant placed the child's health and safety at risk when she defied a court order prohibiting contact between Lowry and D.P., and failed to believe the allegations of sexual abuse made by D.P. against Lowry. The trial court entered a dispositional order of temporary custody to CSB.
 {¶ 5} The amended case plan, filed May 20, 2003, was adopted by the trial court and required Appellant to: (1) complete a parenting class, demonstrate effective parenting skills, and support her child; (2) maintain a safe, stable home environment; (3) protect her child from abuse and not allow Lowry to have any contact with the child; and (4) complete a psychological evaluation and comply with recommendations.
 {¶ 6} Ultimately, CSB moved for permanent custody and Appellant moved for legal custody. Upon completion of the permanent custody hearing, the trial court terminated the parental rights of Appellant and "John Doe." After obtaining service by publication as to Mullins, the trial court also terminated the parental rights of Mullins and ordered the child to be placed in the permanent custody of CSB.
 {¶ 7} Appellant has timely appealed and has assigned two errors for review.
 II. ASSIGNMENT OF ERROR ONE
"The Trial Court's Termination of Appellant's Parental Rights is not Supported by Sufficient Credible Evidence Meeting the Burden of Clear and Convincing Evidence that Termination of Appellant's Parental Rights was in the best Interest of D.P."
 {¶ 8} Appellant essentially argues that the weight of the evidence does not support the finding that permanent custody was in the best interest of the child. We disagree.
 {¶ 9} Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99. The trial court found that the first prong of the test was satisfied because the child had been in the temporary custody of CSB for at least 12 of the prior 22 months and Appellant does not challenge that finding. Appellant challenges only the finding that it was in the best interest of the child to be placed in the permanent custody of CSB.
 {¶ 10} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)-(4).[1]
"Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, at 6. See, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 11} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoptionof Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 12} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), 9th Dist. No. 18983. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 13} Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence in this context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
 {¶ 14} A review of the evidence presented at the permanent custody hearing reveals that CSB established by clear and convincing evidence that permanent custody was in the best interest of D.P.
1. The interaction and interrelationship of the child.
 {¶ 15} Several witnesses presented testimony that is relevant to this best interest factor. First, Carol Downs, outpatient therapist at Child Guidance and Family Solutions, testified regarding her weekly sessions with D.P., her observations of visitations, and her work with Appellant. Downs had been D.P.'s therapist for three years.
 {¶ 16} When Downs first began working with D.P., the child was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and borderline intelligence functioning. At that time, D.P. was having a great deal of difficulty maintaining control and staying focused. She was in an integrated school program, but having difficulty socially and academically. The foster mother saw a great deal of defiance, aggression, anger and temper in the child. D.P. was placed on adderall for ADHD and risperdal. She began to stabilize and make some progress.
 {¶ 17} After eight to ten months of counseling D.P., Downs began to involve Appellant in the counseling sessions to prepare for the child's anticipated move back home. When visits were initiated in the home, the child reportedly spoke to both the foster mother and Downs about inappropriate touching by a boyfriend of Appellant. Downs began to work on boundary issues and issues of good touch/bad touch. A plan was devised which would bar the boyfriend from having any contact with the child, and preparations continued toward returning the child to the home.
 {¶ 18} The child was, in fact, returned to Appellant's home in October 2002 for approximately five months. Downs testified that while D.P. was in Appellant's care, the child did not get to her appointments with doctors or therapists consistently at all. According to Downs, the child regressed during this period. She lost many social skills as well as the ability to be compliant with rules. She also became very baby-like in her behavior. D.P. reportedly lost the ability to be trustful of people and was less willing to talk about her feelings. She was more sullen and withdrawn. There was also a great increase in wetting behaviors.
 {¶ 19} D.P. was removed from Appellant's care in February 2003 upon reports that Lowry was residing in the home, and she has remained in the temporary custody of the agency since that time. Since D.P. was returned to CSB custody, the child has met regularly with Downs and has made some progress. Specifically, she made progress in terms of mood stability, though her mood still varies depending on events in her life. She does not demonstrate baby-like behavior as much. She is in a special education program at school and is functioning to her ability. She is proud of herself, and is a little more self-responsible. She has generally become more compliant in her behavior, though on visitation days her moods are more unpredictable. Downs stated that much of D.P.'s behavior has to do with the issue of whether she feels safe and secure in her environment.[2]
 {¶ 20} Downs also testified regarding the visitations between D.P. and Appellant which she had monitored. She observed that there is an attachment between them, and the two were very appropriately affectionate and happy to see each other at visits. Downs observed, however, that D.P. generally relates to her mother as a peer or a friend, rather than as a parent. In addition, Downs said she does not believe Appellant can properly redirect D.P. when problems occur, as the child frequently simply ignores her. Appellant becomes easily irritated and is short-tempered when D.P. misbehaves. Appellant is inconsistent in applying discipline — being either too harsh or too lenient. Moreover, Appellant does not have a good understanding of the problems created for D.P. when her environment is not predictable, structured, and consistent. Downs testified that Appellant once said to the child, "Well, you're on all these medications, so why can't you behave better than what you are showing right now?"
 {¶ 21} In conclusion, Downs stated that D.P. is a special needs child and functions cognitively at the level of a four or five-year-old. She will need to continue working with a child psychiatrist on her multiple diagnoses and also to monitor her medications. D.P. may also require continued therapy or counseling. She will need to continue in special education programs and requires a care-giver who can work well with the schools to help her reach her potential. Downs expressed concern regarding the type of relationship that exists between Appellant and D.P., and further concern that Appellant cannot provide the structure and predictability that the child needs to do her best. Downs stated that she has not seen evidence that Appellant has the ability or parenting skills needed to be successful with D.P. and help her meet her potential.
 {¶ 22} In regard to the child's relationships with others, Downs testified that there is a very strong and positive bond between D.P. and her foster mother. D.P. had been with the same foster parent during both temporary custody placements. Downs stated that D.P. has the ability to form new relationships and also believes that there are families available that can meet her needs.[3]
 {¶ 23} The next witness addressing the interaction and interrelationships of the child was Ann Quinn, the child's foster mother. Quinn has 11 years experience as a foster parent. She explained that she is not seeking to adopt D.P., but only to help her be adopted. Quinn testified that during the child's first foster placement with her, D.P. still had some of her behaviors, but had calmed down, learned to read and do math, was eating on a regular schedule, had started to come under control and was not fighting everyone. She stated that when D.P. returned from five months of Appellant's care in February 2003, her behaviors were out of control. She was very baby-like, would not cooperate or listen, and was very physically aggressive. She was wetting herself all the time and did not want to cooperate or go to school.
 {¶ 24} Since D.P.'s return to foster care, Quinn has taken the child to weekly therapy sessions and to a doctor to monitor her medications for bi-polar disorder and ADHD. With very structured conditions, D.P. has improved somewhat, but she continues to be difficult to control. When it is time for visits with Appellant, D.P. tends to wet herself more, and is less cooperative both at home and at school. There is more improvement when she does not have visits. Quinn also stated that D.P occasionally demonstrates sexualized behaviors.
 {¶ 25} Next, Carolyn Dibble, the CSB caseworker assigned to the case since December 2001, testified. She addressed Appellant's compliance with the case plan. She stated that Appellant completed a parenting class, but questioned whether she can apply those skills. Dibble stated that the maternal grandmother did most of the parenting during visitations and that Appellant behaved more like a sibling to her child. Dibble said that D.P. went to her grandmother for comforting, rather than to her mother. D.P. also viewed the grandmother as the authority figure.
 {¶ 26} The case plan also required Appellant to maintain safe, stable housing. Dibble testified that Appellant has no disabilities, but does not have a job. She lives with her own mother, Bessie Cogar, who pays the rent and utility bills from her social security and pension. Appellant explained, during her own testimony, that she participated in a work program and gets food stamps in exchange for that work. She contributes those food stamps to the household budget. Appellant also testified that she had worked at several fast food restaurants in the past and was presently seeking employment. The maternal grandmother testified that she had some difficulty with vision, but could supervise D.P. She also stated that Appellant cooks, cleans, and does the laundry in the home.
 {¶ 27} In addition, the case plan required Appellant to obtain a mental health assessment and follow the recommendations. Appellant claimed she did not know how to obtain an assessment, but did begin bi-weekly counseling at Portage Path in February 2004. She admitted that she waited nine months before beginning the counseling, but claimed that it is now helping her.
 {¶ 28} Appellant was reported to be fairly consistent in attending visitations. In August 2003, the visitations were moved from the visitation center to Akron Child Guidance so that the interaction and parenting skills could be evaluated under the supervision of that agency.
 {¶ 29} In addition to relationships with Appellant and the maternal grandmother, D.P. also appears to have a relationship with David Page and his family. Page sought legal custody below, but has not appealed from the denial of his motion. It is unclear whether he would have any continuing relationship with D.P. even if the child were placed with Appellant. Appellant testified that she also has an aunt and cousins in the Akron area, but there was no testimony regarding any regular relationships with those relatives.
2. The wishes of the child.
 {¶ 30} R.C. 2151.14/(D)(2) provides that the wishes of the child may be expressed "directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." Unfortunately, this nearly eight-year-old child was not given an opportunity to express her own wishes as to custody directly to the trial court. See In re D.M.Children, 9th Dist. No. 22206, 2004-Ohio-6369, at ¶ 40.
 {¶ 31} While Jeffrey Myers, the guardian ad litem, had reservations and "very reluctantly" came to his conclusion, he nevertheless recommended permanent custody in this case, because this child clearly needs stability and he believes that Appellant cannot offer stability or provide adequate care for D.P. Myers testified that although the child has a relationship with Appellant, it is more of a companionship than a parent-child relationship. Myers opined further that neither Appellant nor the maternal grandmother could manage to provide sole care for the child over the long-term. Myers stated he believes that the child could be adopted because her special needs are not that great.
3. The custodial history of the child.
 {¶ 32} Appellant's attendance at visitations has been very good. However, the custodial history of the child reflects that she has spent 30 months of the last three years in the temporary custody of CSB. The evidence also indicated that D.P.'s behavior deteriorated while she was in Appellant's care and when she was told of an upcoming visitation.
 {¶ 33} Appellant contends that Lowry is no longer a presence in her life, and, in her appellate brief, cites language from the record of the permanent custody hearing by the trial judge indicating a lack of reliable evidence that Lowry was a "perpetrator." However, in its judgment entry, the trial court specifically found that D.P. had been "sexually abused by one of [Appellant's] boyfriends while in [her] custody" and that thereafter Appellant violated a court order by permitting "contact between the boyfriend and [D.P.]"
4. The child's need for a legally secure permanent placement.
 {¶ 34} Downs, D.P.'s therapist, testified that D.P. needs permanency and stability in her life. She believes the child will make more progress when the uncertainties in her life are resolved. As stated above, when D.P. was returned to Appellant's home, Appellant was not transporting the child to all her appointments and the child's behavior and social skills deteriorated. Downs explained that the uncertainty in the child's life has caused her problems to continue. Downs stated that she believes D.P. feels an attachment to Appellant, but at the same time does not feel safe and secure in that environment. Downs stated that D.P., in fact, told her that while she likes visiting with her mother, she feels safe and needs to live with her foster mother. Downs also testified that D.P. has the ability to form new relationships and that there are families available that can meet her needs.
 {¶ 35} Caseworker Dibble testified that D.P. was a very difficult child. She has special needs and is developmentally disabled. She qualifies for MRDD services and attends special education classes. Dibble testified that she did not believe Appellant had the ability to deal with all of D.P.'s problems, and believes the difficulties will increase as the child gets older.
 {¶ 36} Dibble also stated that no relatives were willing and able to accept custody of the child. Dibble stated that D.P. needs a safe, secure home where she can grow and thrive. She does not believe that D.P. can achieve that with Appellant. Dibble believes it is in the best interest of the child to be placed in the permanent custody of CSB. She believes that D.P. is likely to be adopted because she is young and physically healthy. Her developmental problems will not preclude adoption.
 {¶ 37} Based upon a review of the evidence before the trial court on each of the best interest factors, we conclude that the weight of the evidence supports the judgment of the trial court. The first assignment of error is accordingly overruled.
 ASSIGNMENT OF ERROR TWO
"The Trial Court Lacked Jurisdiction to Terminate the Parental Rights of Appellant as There was not Notice of the Hearing Given to all Parties."
 {¶ 38} Appellant contends that her rights were prejudiced because the alleged father, Russell Mullins, did not have notice of the permanent custody hearing. We disagree.
 {¶ 39} Until the permanent custody hearing in this case, David Page was generally assumed to have been the biological father of the child, as well as being legally presumed to be the father because he was married to Appellant at the time of the child's birth. See R.C. 3111.03.(A)(1). Both Page and Appellant were properly served with notice of the complaint and subsequent hearings in this matter.
 {¶ 40} At the commencement of the first day of the permanent custody hearing, however, Appellant disclosed that one Russell Mullins might, in fact, be the biological father of the child. Appellant also indicated that she had been aware of this fact since she was pregnant with the child. Following testimony by Appellant that Page and Mullins were the only two possible fathers, the trial judge ordered genetic testing as to Page and also ordered service of process as to Mullins. Upon the agreement of all parties that were present, the trial court proceeded to hear testimony from David Page's psychologist and from D.P.'s therapist. The trial judge indicated that, if Mullins subsequently appeared, a transcript of the testimony would be made available to Mullins' counsel and he would be afforded the right to recall the child's therapist.
 {¶ 41} During the ensuing continuance of the hearing, mail service was attempted at least twice on Mullins, — on March 18, 2004 and April 14, 2004 — but was returned as incomplete. "John Doe" service by publication was accomplished on April 9, 2004. On May 14, CSB renewed its motion for permanent custody, naming Mullins as the alleged father. The permanent custody hearing concluded on June 24, 2004. Service by publication, specifically naming Russell Mullins, was accomplished on July 12, 2004.
 {¶ 42} On July 26, 2004, the trial court found that Mullins had been served by publication, that he had not made an appearance in the case, and that he had had no contact with the child since shortly after her birth. Accordingly, the trial court terminated Mullins' parental rights as to D.P. and granted the motion of CSB for permanent custody of the child. Appellant filed a notice of appeal on August 12, 2004. Neither Page nor Mullins has appealed.
 {¶ 43} Appellant argues that the hearing might have progressed differently if Mullins had been present. Such argument is mere speculation. In any event, Mullins was ultimately served with notice of the proceedings — albeit by publication — and failed to appear.
 {¶ 44} Appellant cites two cases in support of her position. We find neither to be compelling. First, she cites In re Sims, 7th Dist. No. 02-JE-2, 2002-Ohio-3458, at ¶ 43, for the proposition that the trial court lacks authority to terminate parental rights without also placing the child in permanent custody. In Sims, the judgment entry of the trial court terminated parental rights, but failed to place the child in the permanent custody of a children's services agency. In the case at bar, the trial court first terminated Appellant's parental rights, and subsequently placed D.P. in the permanent custody of CSB. Appellant's notice of appeal followed. Therefore, the procedural facts are not the same as in Sims because, in the present case, the child was placed in the permanent custody of CSB by order of the trial court. Further, while separate orders may not represent the best practice by which to terminate parental rights and place a child in permanent custody, there is no demonstrated prejudice to Appellant.
 {¶ 45} Appellant next cites In re Harlston, 8th Dist. No. 80672, 2003-Ohio-282, at ¶ 57, for the proposition that "service upon both parents is necessary in permanent custody proceedings[.]" Id. Harlston,
however, also indicates that the failure of a timely objection to the lack of service constitutes waiver. Id. at ¶ 56. In the present case, service was eventually obtained upon Mullins, but in addition, no timely objection as to notice or jurisdiction was entered by Appellant.
 {¶ 46} In the case at bar, Appellant did not advise the trial court of the existence of another potential father until the day of the permanent custody hearing, even though she was aware of the possibility that another man might have been the biological father of D.P. since before these proceedings began. Her attorney did not enter an objection until the second and last day of the permanent custody hearing, June 24, 2004. Furthermore, that objection was grounded only on the fact that if Mullins subsequently appeared, it would cause a delay that would not be in the best interest of the child. ("I just would like to put an objection on the record to going forward just because I think that ultimately if permanent custody would be granted and Mr. Mullins would subsequently appear, I just think that would cause a delay that would probably not be in [D.P.'s] best interest.") The record in the present case indicates that Mullins did not enter an appearance in the proceedings below. Moreover, the only actual delay was caused by Appellant's tardy notification that Mullins might be the biological father of the child rather than her husband, Page.
 {¶ 47} To permit Appellant to claim error in this fashion would allow parties to manipulate the system in a manner that is not in the best interest of the child. Here, the trial judge obtained service upon Appellant, Page, "John Doe," and Mullins; terminated parental rights; and entered an order placing the child in the permanent custody of CSB — allbefore Appellant filed her notice of appeal. Consequently, we conclude that any error is harmless and the second assignment of error is overruled.
 III. {¶ 48} Appellant's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Carr, P.J., Slaby, J., Concur.
[1] The factor set forth in R.C. 2151.14(D)(5) is not relevant in this case.
[2] For example, Downs testified that D.P.'s behavior regressed after Appellant was reported to have given D.P. a stuffed unicorn from Lowry. Previously, D.P. had openly discussed Lowry's touching of her and her feelings, but afterwards, she regressed, adopted baby-like behavior, and refused to talk about the incident, explaining that it was a "secret." Since then, D.P. has improved somewhat, but has never again been as forthcoming about the incident. The record also indicates that Appellant denied giving D.P. a stuffed unicorn, and denies knowledge of anyone giving her such a gift.
On another occasion, Downs testified that D.P. overheard Appellant saying that she was preparing D.P.'s room for her return. After that, D.P.'s wetting behavior increased significantly.
[3] In her appellate brief, Appellant complains that CSB presented the testimony of D.P.'s therapist at the permanent custody hearing, but did not call her psychiatrist. Appellant does not explain, however, why she did not call the psychiatrist as her own witness, if she believed such testimony might have been helpful to her position.